[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**FEBRUARY 28, 2003**
**THOMAS K. KAHN**
**CLERK**

No. 00-14413

D. C. Docket No. 96-01738-CV-RWS-1

ATLANTA JOURNAL AND
CONSTITUTION, USA TODAY,
a division of Gannett
Satellite Information Network
("GANSAT"), Inc.,

Plaintiffs-Appellees,

NEW YORK TIMES COMPANY,
d.b.a. The New York Times,

Intervenor-Plaintiff,
Appellee,

versus

THE CITY OF ATLANTA DEPARTMENT
OF AVIATION, BENJAMIN R. DECOSTA, in
his official capacity as Aviation
General Manager, City of Atlanta,
MARIO DIAZ, in his official
capacity as Aviation Deputy
General Manager, City of Atlanta,
SHIRLEY FRANKLIN, in her official
capacity as Mayor, City of Atlanta,

Defendants-Appellants.

ATLANTA JOURNAL AND
CONSTITUTION,
USA TODAY,

                                                  Plaintiffs-Appellees,

NEW YORK TIMES COMPANY,
d.b.a. The New York Times,

                                         Intervenor-Plaintiff,
                                                  Appellee,

versus

THE CITY OF ATLANTA DEPARTMENT
OF AVIATION, BENJAMIN R. DECOSTA, in
his official capacity as Aviation
General Manager, City of Atlanta,
MARIO DIAZ, in his official capacity
as Aviation Deputy General Manager,
City of Atlanta, SHIRLEY FRANKLIN,
in her official capacity as Mayor,
City of Atlanta,

                                         Defendants-Appellants.

_____

No. 00-15185

_____

D. C. Docket No. 96-01847-CV-RWS-1


USA TODAY, a division of
Gannett Satellite Information
Network ("GANSAT"), Inc.,

                                                                    Plaintiff-Appellee,


NEW YORK TIMES COMPANY,
d.b.a. The New York Times,

                                                                    Intervenor-Plaintiff,
                                                                              Appellee,


                                    versus


CITY OF ATLANTA DEPARTMENT
OF AVIATION, BENJAMIN R. DECOSTA,
in his official capacity as
Aviation General Manager, City
of Atlanta, MARIO DIAZ, in
his official capacity as Aviation
Deputy General Manager, City of
Atlanta, SHIRLEY FRANKLIN, in her
official capacity as Mayor, City of
Atlanta,

                                                                    Defendants-Appellants.


3

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(February 28, 2003)**

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, MARCUS, WILSON and HILL[*],
Circuit Judges.[**]

BIRCH, Circuit Judge:

In this appeal, we decide whether a government agency, statutorily charged
to be self-sufficient and acting in such proprietary capacity, is permitted to assess
profit-conscious fees on expressive activities for use of distribution facilities in a
non-public forum. The district court found that the assessment of any fee in
excess of administrative costs was contrary to the First Amendment of the United
States Constitution and precedent in this circuit under <u>Sentinel Communications
Company v. Watts</u>, 936 F.2d 1189 (11th Cir. 1991). The district court granted a
permanent injunction against the City of Atlanta Department of Aviation,
prohibiting, <u>inter alia</u>, the City of Atlanta from charging newspaper publishers any
fee for the use of the Hartsfield Atlanta International Airport's newsracks in

_____

[*] Senior United States Circuit Judge James C. Hill elected to participate in this matter
pursuant to 28 U.S.C. § 46(c).

[**]United States Circuit Judge Frank M. Hull is recused.

excess of the administrative costs associated with that use.[1]  On appeal, we

affirmed the district court's permanent injunction.[2]  Subsequently, we vacated our

decision and granted a rehearing en banc.[3]  After rehearing, we overrule part of

our prior decision and hold that a government agency, statutorily mandated to be

self-sufficient and acting pursuant to that charge, is permitted to assess a

reasonable profit-conscious fee to newspaper publishers for the use of the airport's

distribution facilities.  Accordingly, the district court's grant of summary judgment

with regard to the 1996 Plan[4] fees provision and consequent injunction is

VACATED and the case is REMANDED.

## I.  BACKGROUND

A.  Hartsfield Atlanta International Airport

Hartsfield Atlanta International Airport (the "Airport"), located in Atlanta,

Georgia, is owned by the City of Atlanta (the "City").  Pursuant to statutory

---

[1]  Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 107 F. Supp. 2d 1375, 1382, 1384 (N.D. Ga. 2000) ("AJC I").

[2]  Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 277 F.3d 1322 (11th Cir. 2002) ("AJC II").

[3]  Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 298 F.3d 1251 (11th Cir. 2002).

[4] The 1996 Plan (hereinafter the "Plan") is, inter alia, the City of Atlanta Department of Aviation's proposed policy regarding the selection, placement and fees for the distribution of newspapers through newsracks by newspaper publishers.  The different parts of the Plan are described in detail infra.

authority, the City of Atlanta Department of Aviation (the "Department") operates the Airport. O.C.G.A. § 6-3-1, 6-3-20; City of Atlanta Charter § 1-102(c)(9). The Department is required to operate the airport in a proprietary manner and is vested with authority to charge fees for the use of airport space by any "revenue-producing activity." Atlanta City Code §§ 22-62 & 22-82. The City Code also restricts the use of these fees to the "cost of constructing, paying debt service on maintaining and operating the airport, together with the incidental navigation facilities, and maintaining the airport in a reasonably safe condition." Id. § 22-81. The fees cannot be used by the City as general revenues.

Moreover, the Airport receives federal funding and therefore is required, to the extent reasonable, to operate the airport in a self-sufficient manner. 49 U.S.C. § 47107(a)(13). The federal law, with few exceptions, mandates that airport revenues be used exclusively for capital or operating costs of the airport, and prescribes provisions for accountability and enforcement of same. See §§ 47107(b)(1) and (l). The intent of Congress is clear. The statutory policy statement, found in § 47101, provides that the "airport fees, rates, and charges must be reasonable" and

> that airports should be as self-sustaining as possible under the circumstances existing at each particular airport and in establishing new fees, rates, and charges, and generating revenues from all

6

sources, airport owners and operators should not seek to create revenue surpluses that exceed the amounts to be used for airport system purposes and for other purposes for which airport revenues may be spent under section 47107(b)(1) of this title, including reasonable reserves and other funds to facilitate financing and cover contingencies.

§ 47101(a)(12) and (13). Thus, on both federal and state levels, the Airport is charged with the responsibility to operate its facility focused on its "bottom line."

The Airport is uniquely situated to profit from the patronage of the travelers frequenting its concourses. On a yearly basis, over sixty-three million people pass through the Airport. Although located in the City, the Airport is an island of commercial activity. Thus, given the captive market of the harried travelers, the Airport and its vendors have virtually monopolistic access to supply items of convenience, refreshment and entertainment, often at prices stretching the outside capacity of an otherwise inelastic demand curve. Approximately one-half of the Airport's revenue is generated by concessions and parking. This monopoly position also extends to any vendor or advertiser desiring to lease space in the Airport facility because the Department has sole authority to lease the premises to whomever it chooses. For example, in 1996 the Airport, through an agency, charged between $62 and $111 per square foot per month for advertising space.

B. Pre-Plan Newspaper Distribution Methods

In the fifteen years prior to 1995, the Airport was party to a master concessions agreement, which delegated the exclusive right and responsibility to market concessions to Dobbs, Pascal, Midfield Corporation.  Airport News, the newsstand concessionaire, sub-contracted for the exclusive right to sell newspapers in the Airport.  Initially, only newsstands sold newspapers.[5]  As part of its contract, Airport News newsstands were required to carry The Atlanta Journal and Constitution, USA Today, and The New York Times.  In 1980, The Atlanta Journal-Constitution ("AJC") attempted to place its own newsracks in the Airport and Airport News sued AJC's publisher, Cox Enterprises, over the unauthorized placement of newsracks in the Airport.  Pursuant to a settlement agreement with AJC, Airport News permitted that newspaper publisher to distribute newspapers in eighteen stand-alone newsracks, located as approved by Airport News so as not to detract from the newsstand revenues.  AJC paid Airport News a fee of 30% of the gross revenue from newspapers sold through newsracks at the Airport, a portion of which (approximately 11%) was remitted to the City by the concessionaire.  USA Today paid a 20% fee derived from gross newsrack sales

_____

[5]  For purposes of this opinion, we consider "newsstands" to be attended stores, open for business during pre-determined hours, that sell various items, in addition to newspapers, such as snacks, drinks, magazines, sundries, etc.  In contrast, a "newsrack" is a stand-alone vending machine that permits the unassisted customer to purchase a single newspaper at any time.

under a similar arrangement. In comparison, the Airport received not less than 20% of the gross revenue from other vending machines. The master concession agreement expired in September 1995.

In 1995, the Airport and the City were undertaking a physical and operational restructuring in preparation for the 1996 Summer Olympic Games. The Airport management took this opportunity to renovate the Airport and revamp the appearance and services available to the public coming to and through the Airport. A main focus of their efforts was to provide a more customer-friendly concession selection and to "giv[e] a sense of place" to the Airport. Baker Dep. at 40:4-11. When the master concessions agreement expired, the City resumed sole control over the newsracks. During the renovation construction period, most newsracks were removed, and the newspapers stopped paying the monthly assessment on the remaining newsracks. The Airport sought to establish a uniform newsrack policy and developed a plan for appropriating standard newsracks and leasing them to the newspaper publishers (the "Plan"). The Plan spawned six years of litigation, culminating in this appeal.

C. The Plan

The Airport, in part through the efforts of Steve Baker, Deputy General Manager of the Department, developed a "Design Criteria" and concessions plan

involving, _inter alia_, the distribution of newspapers. The underlying theme, as explained to the newspaper publishers, was to "control the appearance of customer service concessions and reduce visual clutter." R3-47, Baker Aff. at 5, ¶ 14. Underlying these stated goals was the general understanding that the Airport was statutorily mandated to operate in a self-sufficient manner, and therefore the generation of profits was integral to the Plan.

Four components of the Plan were at issue before the district court. While one part of the Plan will command the main focus of our attention, a general overview of each point is helpful.[6] First, the Airport determined that it would provide uniform City-owned newsracks placed strategically throughout the Airport and leased to the various newspapers. Individualized racks were no longer permitted in the Airport. Second, per a joint venture with The Coca-Cola Company ("Coca-Cola"®), these newsracks were outfitted with Coca-Cola advertising. Coca-Cola, in exchange, financed one-half of the capital outlay for the newsracks. The AJC had also been approached by the Department with the proposition of designing and supplying uniform newsracks, yet it chose not to

---

[6] Indeed, the facts of this case are set forth in varied detail in the judicial decisions preceding this opinion. Given the limited issue before us, we will not embark on a complete exposition of the history of this case. Instead, we incorporate by reference the facts as set forth in these opinions. See supra notes 1-2. In addition, this case contains a contentious procedural history, which we recognize but will not address.

10

participate. Ultimately, Coca-Cola designed and procured the newsracks, financing one-half the cost as agreed. The newspapers were informed that any other advertising displays on the newsracks by the newspaper publishers were not permitted, other than a single content-identifying strip, subject to Department approval.[7]

Third, the newspapers were required to apply to the Department for a permit to place their newspapers in the City-owned newsracks. The newspapers would remain responsible for the daily maintenance and inventory of their newsracks. Either the Department or the newspaper could terminate the permit on thirty days' notice. "Requests for locations [were] subject to availability at the time of the request and the desire of the Department of Aviation to present a diversity of publications in a coherent manner." R1-1, Ex. E, News Box Term Sheet.

Fourth and finally, the primary issue before us is the $20 per month rental fee charged to the newspapers for the use of each newsrack. The Department submitted evidence to partially demonstrate how this $20 figure was determined. The original newsrack cost $500; half of that amount was financed by Coca-Cola.

---

[7] Other than this general overview, we are not rehearing and will not be discussing the constitutionality of the Coca-Cola advertising on the newsracks. Our prior panel decision, Atlanta Journal and Constitution v. City of Atlanta Department of Aviation, 277 F.3d 1322 (11th Cir. 2002), correctly reviewed the district court's grant of summary judgment on this issue, and we adopt its analysis herein.

The newsracks were assigned a useful life of 5 years, over which the Department sought to recoup the $250 balance. The useful life was determined by the Department "to maintain the level of appearance at the airport." Baker Dep. at 222:14-15. There was no empirical evidence introduced to reflect the useful life of a newsrack. The fee included an additional "airport-required" 7% return on its investment to compensate for the cost of capital. R3-47, Baker Aff., Ex. 7.

D. The Permanent Injunction

On 9 July 1996, AJC filed a complaint in the district court, claiming that the Plan was unconstitutional and requesting injunctive relief and a temporary restraining order ("TRO"). On 10 July 1996, the district court conducted a hearing and granted the TRO. USA Today filed a similar action and, on 18 November 1996, the USA Today case was consolidated. On 24 January 1997, The New York Times filed a motion to intervene and the district court granted that motion on 29 May 1997.[8]

On 24 July 2000, the district court granted summary judgment in part and enjoined the Department from enforcing any newsrack plan. The district court denied summary judgment on the issue as to whether the Department was

---

[8] All record citations in this opinion are to the district court's file for the original case filed by The Atlanta Journal and Constitution, No. 1:96-CV 1738 (WBH).

12

permitted to restrict the number and placement of the newsracks, finding it could not rule as a matter of law on the reasonableness of the Plan. The court granted summary judgment on the other three bases.  First, the court found that the Coca-Cola advertising portion of the plan was unconstitutional because it contained an unreasonable distinction based upon speaker identity.  Second, the court found the fees provision was impermissible because the Department charged in excess of administrative costs, conduct contrary to our decision in Sentinel Communications Company v. Watts, 936 F.2d 1189 (11th Cir. 1991).  Third, also relying on Sentinel, the district court ruled that the Department's unrestrained discretion in deciding which publications were given permits for the newsracks was unconstitutional.  Upon these bases, the district court granted a permanent injunction prohibiting the Department from

> enacting any newsrack plan at Hartsfield Atlanta International Airport which features any of the following characteristics:
> (1) The Department must not adopt a newsrack plan which forces publishers to use newsracks bearing advertisements for other products;
> (2) the Department must not adopt a newsrack plan which requires publishers to pay a fee which is not tied to the Department's costs in administering its newsrack plan; and
> (3) the Department must not adopt a newsrack plan which vests unbridled discretion in the person or persons responsible for
> (A) selecting publications which may place newsracks at the airport, or

13

(B) determining whether publications which are allowed to place newsracks at the airport may continue to maintain newsracks at the airport.

AJC I, 107 F. Supp. 2d at 1384.

On 22 August 2000, the Department filed an appeal. We issued our opinion, affirming the district court. However, we expressed reservation as to whether it would be appropriate for the Department, acting in a proprietary capacity, to assess a profit-generating fee in excess of administrative costs. AJC II, 277 F.3d at 1329. On 24 July 2002, we vacated the panel's opinion and ordered this case to be reheard en banc.

## II. DISCUSSION

A. First Amendment Scrutiny

The distribution of newspapers, no less than the publication of the newspapers themselves, is an activity protected by the First Amendment. Lovell v. City of Griffin, Ga., 303 U.S. 444, 452, 58 S. Ct. 666, 669 (1938). Accordingly, a government (here, the City) is subject to certain limitations on the type and content of the restrictions it may place on this activity.

Generally speaking, the City is precluded from making content-based restrictions on expression protected by the First Amendment unless it advances a compelling interest and employs the least restrictive means to advance that

14

interest.  Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S. Ct. 2829, 2836 (1989).  However, the City may regulate expression on non-content grounds through "reasonable time, place, and manner restrictions," see, e.g., Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298-99, 104 S. Ct. 3065, 3071-72 (1984), consistent with the notion that "[c]ivil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses."  Cox v. New Hampshire, 312 U.S. 569, 574, 61 S. Ct. 762, 765 (1941).

This statement of the law controls when the City seeks to regulate speech within a public forum or a designated public forum, as those places have come to be understood in First Amendment jurisprudence.[9]  See Int'l Soc. for Krishna Consciousness, Inc. v. Lee ("ISKCON"), 505 U.S. 672, 678, 112 S. Ct. 2701, 2705 (1992).  If the property is a public forum or a designated public forum, then any content-based restrictions on speech within that forum are highly scrutinized: the restrictions must be narrowly drawn to serve a compelling state interest.  Id.  "In a public forum, by definition, all parties have a constitutional right of access and the

---

[9] Based on ISKCON, 505 U.S. at 678, 112 S. Ct. at 2705, there are three cognizable types of government property: (1) the public forum, which is property of a type "traditionally . . . available for public expression"; (2) a designated public forum, which is property specifically designated by the State for expressive activity; and (3) a nonpublic forum, which is all government-owned property not traditionally or explicitly designated as a public forum.

15

state must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 55, 103 S. Ct. 948, 960 (1983).

When the City seeks to regulate speech on government-owned property which is not a public forum or a designated public forum, the standard is modified, becoming more deferential to regulation. If the property is a nonpublic forum, then the City "ha[s] 'no constitutional obligation per se to let any organization use the [forum].'" Id. at 48, 103 S. Ct. at 957 (quoting Connecticut State Fed'n of Teachers v. Board of Educ. Members, 538 F.2d 471, 481 (2nd Cir. 1976)). "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." United States Postal Serv. v. Council of Greenburgh Civic Ass'n, 453 U.S. 114, 129-130, 101 S. Ct. 2676, 2685 (1981) (quotation marks and citation omitted). "[O]n government property that has not been made a public forum, not all speech is equally situated, and the state may draw distinctions which relate to the special purpose for which the property is used." Perry, 460 U.S. at 55, 103 S. Ct. at 960.

Therefore, in a nonpublic forum, the City may properly restrict exercise of expression that is inconsistent with the intended use or function of that property through reasonable, viewpoint-neutral regulations. See ISKCON, 505 U.S. at 679,

16

112 S. Ct. at 2705. That is, even content-based restrictions, which in other venues would be subject to strict scrutiny, are constitutional so long as they are a reasonable, viewpoint-neutral attempt to ensure that the facility serves its intended purpose. "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." Perry, 460 U.S. at 49, 103 S. Ct. at 957. This deferential standard is a "much more limited review" than that applicable in a public or designated public forum. ISKCON, 505 U.S. at 679, 112 S. Ct. at 2705.

In this case, the forum in question is the Airport, which is City-owned. Government-owned commercial airports, such as Hartsfield, are not public fora. Id. at 680-82, 112 S. Ct. at 2706-08. There is no argument from the parties that the airport is a designated public forum under the circumstances of this case, and, accordingly, we will employ the more deferential standard appropriate for regulation of nonpublic forum expressive activity.

Our examination of the Plan is restricted to two major bases that led the district court and our panel to declare the scheme unconstitutional: first, the profit-

17

conscious fee for rental of the newsracks, and, second, the unrestrained discretion

vested in a government official responsible for setting that fee and choosing which

publications could use the newsracks.  Though the Department has proffered

numerous reasons to support its newsrack regulation, we need discuss only one, its

interest as a proprietor, to resolve the first issue before us.[10]  The regulations are

constitutionally valid if they are reasonable and viewpoint neutral.  We find no

question that the regulations are viewpoint neutral, and, therefore, we focus on

their reasonableness below.

## B.  Reasonableness

To sell newspapers from newsracks at the Airport, a vendor must pay a fee,

set entirely in the discretion of the Airport authorities, for one or more of the

designated newsracks placed in an approved area of the main terminal.  No private

newsracks may be installed, nor may any of the available newsracks be modified

---

[10]  The newspapers contend that the Department has no evidence to support its proffered reasons for regulating newsracks at the Airport, and that the Department has offered a variety of shifting reasons for that decision throughout this litigation.  The district court declined to grant summary judgment for the publishers on the reasonableness of the Department's initial decision to restrict the area and facilities for newsrack distribution, finding that "the reasons offered by the Department are quite susceptible to attack as being post-hoc, pretextual justifications for actions purely motivated by a desire to [profit]."  AJC I, 107 F.Supp.2d at 1379.

Given the issues on which we focus during this rehearing en banc, we do not need to examine the myriad of alternate rationales for the Plan, because we ultimately find that the Airport's interest as a proprietor, which no one claims is pretextually held, justifies its imposition of a profit-conscious fee, and we also find that no interest proffered by the Airport justifies its grant of boundless discretion to the official charged with administering the newsrack Plan.

or moved to other areas of the terminals. The fee required by the Airport for use of these terminals includes a profit component; the fee is above and beyond that amount needed to recoup administrative costs surrounding the installation and maintenance of the newsracks by the Airport. In simplest terms, the Department, in a manner indistinguishable from private sector business, charges the publishers rent for the privilege of selling their papers through the Airport's newsracks.

We examine the City's restrictions for reasonableness given the surrounding circumstances. Restrictions must only be reasonable; "[they] need not be the most reasonable or the only reasonable limitation[s]." ISKCON, 505 U.S. at 683, 112 S. Ct. at 2708 (quoting United States v. Kokinda, 497 U.S. 720, 730, 110 S. Ct. 3115, 3122 (1990) (plurality opinion)). The contours of the allowed distribution is not dictated by the publishers' preferences; the First Amendment does not guarantee the least expensive method of distribution, and the City is free to approve an alternative scheme that results in higher costs for the publishers, assuming that such scheme is reasonable overall. Kovacs v. Cooper, 336 U.S. 77, 88-89, 69 S. Ct. 448, 454 (1949) (plurality opinion). Thus, we apply this reasonableness standard to the two issues before us, the profit-conscious fee and the discretion granted to the responsible official.

1. Profit-Conscious Fee

19

The central thrust of the publishers' argument concerns the ability of the Department to charge a profit-conscious fee for use of the Airport's newsracks. A profit-conscious fee cannot be justified by reference to any of the Airport's stated concerns about security, or aesthetics, or traffic flow. Rather, to support a profit-conscious fee, the Department must point to its interest in maintaining the Airport as a business.

According to the publishers, *any* fee charged on an activity protected by the First Amendment must be limited to the recoupment of administrative costs associated with that activity; the fee cannot be a method of enhancing general government revenue. In advancing this argument, the publishers point to a line of Supreme Court cases that makes this very point. See Murdock v. Pennsylvania, 319 U.S. 105, 113-14, 63 S. Ct. 870, 875-76 (1943); Cox, 312 U.S. at 577, 61 S. Ct. at 766.

This line of cases does not control the instant case. The Airport is operated as a self-sufficient business by the City, as mandated by statute and required by federal regulation, and the Plan at issue here is an outgrowth of its role as a business proprietor rather than its ordinary role as a regulator. "Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its action will not be

20

subjected to the heightened review to which its actions as a lawmaker may be subject." ISKCON, 505 U.S. at 678, 112 S. Ct. at 2705.[11] See also Kokinda, 497 U.S. at 725, 110 S. Ct. at 3119 (citing Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 896, 81 S. Ct. 1743, 1749 (1961) (finding that consideration of what due process was required in that case turned in part on whether the government exercised power as a regulator or a proprietor) and Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S. Ct. 2714, 2717 (1974) (plurality opinion) (stating that, "in much the same way [as] a newspaper or periodical," the city could enact reasonable restrictions on expression when "engaged in commerce" and when the restriction on speech was "a part of the commercial venture")). However, "[t]he Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business, but its action is valid in these circumstances unless it is unreasonable, or, as was said in Lehman, [418 U.S. at 303, 94 S. Ct. at 2717,] 'arbitrary, capricious, or invidious.'" Kokinda, 497 U.S. at 726, 110 S. Ct. at 3119.

_____

[11] Justice O'Connor, though concurring separately, agrees with the four Justices who join the plurality opinion that this lawmaker/proprietor distinction exists in First Amendment jurisprudence. However, she is quick to point out, as is apparent through other cases, that the government's status as a proprietor by no means allows unfettered restriction of expression. See ISKCON, 505 U.S. at 687, 112 S. Ct. at 2712 (O'Connor, J., concurring).

21

### a. Reasonableness of fee

The proprietor capacity distinction suggests that reasonableness, for purposes of forum analysis, includes a commercial component. In a proprietary capacity, the City has a substantial interest in the "bottom line," and, when the City acts as a proprietor, reasonable regulations may include profit-conscious fees for access for expressive conduct, in a manner similar to fees that would charged if the forum was owned by a private party (i.e., a fee for a auditorium for a dance recital, or a fee for displaying advertisements in a newspaper).

Here, the fee is facially reasonable; it does not appear that the Department is applying monopolistic muscle to the publishers. It would be different if the Department set a prohibitively high fee for use of the newsracks. However, the charges imposed do not strike us as outside the reasonable bounds for this alternative distribution channel granted to the publishers. In addition, the history of regulation at the Airport and the availability of alternative distribution methods for the publishers bolsters the Plan's reasonableness.

History of regulation can be a guarantor that current regulations are constitutionally reasonable. See Kokinda, 497 U.S. at 731, 110 S. Ct. at 3122. The publishers of newspapers at the Airport were subject to profit-conscious fees for use of newsracks even before the imposition of the current Plan, when the

22

exclusive right of newspaper distribution in the airport was granted to Airport News, an independent concessionaire. The publishers, pursuant to negotiated contracts, paid 30% of their revenues to the concessionaire in exchange for the right to place newsracks in the Airport and distribute their wares. A portion of that fee was remitted to the Department. There is no indication that these historical fees were in any way tied to, or limited by, administrative costs. These historical fees do not seem dramatically out of proportion to the flat fee imposed by the Plan.

The availability of alternative distribution methods for the newspapers at the Airport also weighs in favor of finding the Plan constitutional. See Perry, 460 U.S. at 53, 103 S. Ct. at 959. The three appellee newspapers all find themselves with guaranteed distribution channels, because the newsstand vendors are *required* to carry those papers in their stores as a component of their lease with the Airport. Newsstands are a guaranteed substitute market, and, given the landscape of distribution in the Airport, the complaining newspapers in this case are in a preferred position. In sum, "we think it would be odd to conclude that the [Department's] terminal regulation is unreasonable despite the [Department] having otherwise assured access to an area universally traveled." ISKCON, 505 U.S. at 685, 112 S. Ct. at 2709.

23

b. Special fee

The publishers contend that the imposition of this rent for the newsracks creates a special fee imposed on the press in violation of Minneapolis Star & Tribune Company v. Minnesota Commissioner of Revenue, 460 U.S. 575, 103 S. Ct. 1365 (1983).  The First Amendment provides the press no protection from government's generally applicable economic regulation, but does prevent government from treating the press in a special manner.  Id. at 581-85, 103 S. Ct. at 1369-72.

In Minneapolis Star, the State of Minnesota enacted a use tax on the materials necessary for newspaper publication, including paper and ink.  Id. at 577, 103 S. Ct. at 1368.  In comparison to the general taxation scheme of the state, this particular use tax possessed several unique qualities: first, it did not complement the sales tax, as most use taxes do, but rather applied even to those products bought in-state and subject to sales tax; and, second, it was the only use tax imposed on goods that would eventually be made into retail products, that is, the only use tax on "an intermediate transaction."  Id. at 581-82, 103 S. Ct. at 1370.

Because of these unique characteristics, the Court found that the use tax was "without parallel in the State's tax scheme," and "single[s] out the press for special

24

treatment." Id. at 582, 103 S. Ct. at 1370. It was this targeted, unique tax that presented and particularized the constitutional problem. Id. at 585, 103 S. Ct. at 1371-72.[12] "Differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." Id. at 585, 103 S. Ct. at 1372. In order for the tax to pass constitutional scrutiny, the government must proffer an interest of "compelling importance," and an interest that cannot be satisfied in a less suspicious way, to counterbalance these dangers of differential treatment. Id.

The fees imposed by the Department on the publishers are not a special tax on the press, and the Minneapolis Star line of cases has no application here. Instead, these fees are part of the general scheme of the Airport to "tax" those vendors who are granted space in the facility. Every vendor, no matter the type of

---

[12] As the Minneapolis Star Court stated:

> A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. . . . When the State singles out the press . . . the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government.

460 U.S. at 585, 103 S. Ct. at 1372.

goods sold, must remit to the Airport compensation for the granted right of access to the Airport's customers. Calling the newsrack fee a "special tax" is unduly formalistic. True, the contracts made by the Department with the publishers involve a different method of computing the fee due than the contracts with other Airport vendors. Moreover, the amount of the fee is not linked by some mathematical scale to the fees imposed on other vendors in the Airport. However, this is not a fee, like that involved in Minneapolis Star, that has no analogue in the general scheme of regulation. All vendors remit to the Airport a fee for the space they lease or a portion of profits from the goods they sell, or a combination of the two. None of these fees imposed on other vendors is limited to recovery of the Airport's administrative costs. The newsrack Plan is not an aberration within this scheme of vendor regulation.

### 2. Unrestrained Discretion

A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 755-56, 108 S. Ct. 2138, 2143 (1988) (stating that the Supreme Court "ha[s] long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge

26

it facially without the necessity of first applying for, and being denied, a license" (footnote and citations omitted)). Here, we believe that the district court and our panel correctly identified the boundless discretion granted to the Department official responsible for administering the newsrack Plan as exceeding the bounds of constitutionality. None of the Department's proffered reasons for regulation, including its interest as a proprietor, can justify this grant of discretion.

While market forces, ceteris paribus, might constrain the fees charged the publishers to reasonable levels, the City, even acting as a proprietor, retains its power to censor. Such power must be cabined by some standard of First Amendment reasonableness over and above the invisible hand of the marketplace. Structural and procedural safeguards can reduce the possibility that an official will use her power to corrupt the protections of the First Amendment. The official charged with administering the Plan should have clear standards by which to accept or reject a publisher's request to use the newsracks at the Airport. Perhaps a first-come, first-served system, a lottery system, or a system in which each publisher is limited to a percentage of available newsracks would be appropriate vehicles for limiting the official's discretion. We leave the intricacies of the safeguards to the Department, whose knowledge of the practicalities, including

consumer demand, can be applied.[13]  The official in charge must be constrained in some form in her exercise of discretion.

Therefore, though we find that the Department could impose a profit-conscious fee on publishers who wished to distribute newspapers through newsracks, we also find that the manner in which the Department is able to exercise this prerogative runs afoul of the Constitution's concern over unbridled official discretion in the First Amendment arena.  Thus, we reinstate and re-adopt the following portion of the panel opinion:

> [T]he department's plan contains no explicit limits on airport personnel's power to cancel news rack licenses.  On its face, the plan permits the Department to cancel a publisher's license for any reason whatsoever, including unconstitutional reasons such as viewpoint discrimination. Such unbridled discretion vests broad censorial power in government and this the Constitution does not permit.

---

[13]  The official may be charged with considering market forces, such as consumer demand, in making his decisions, in keeping with the coexisting interest of the Airport in generating a profit.  These decisions as a business are permissible; the regulations exist to constrain the temptation of discriminating among publications on viewpoint grounds, not the temptation of discriminating against publications based on whether they are likely to grant a greater return on investment to the Airport.

The line between denial of a permit for business-related reasons, such as consumer demand, and for unconstitutional reasons, such as viewpoint, is admittedly blurry.  Consumer demand may be low for papers that espouse unpopular viewpoints.  Therefore, the effect of making decisions based on consumer demand may be to deny all unpopular viewpoints from the Airport's newsracks.  Especially given that the newsrack fees in this case are a flat fee – that is, the publishers pay a set fee per month for rental of the newsrack, rather than a percentage of gross receipts from sale of their papers through the newsracks – the denial of a permit for business-related reasons harbors a greater risk that the decision is but a mask for censorship of unpopular viewpoints in contravention of the First Amendment.  This risk may be addressed by future regulations concerning newsracks at the Airport.

28

AJC II, 277 F.3d at 1329.

C.  Profit-Making Fees on First Amendment Expression

In Sentinel Communications v. Watts, 936 F.2d 1189 (11th Cir. 1990), we

held that Florida was prohibited from charging publishers five cents per paper sold

at newsracks placed at state-run highway rest stops.  According to the Sentinel

court, the problem with this fee arose from its revenue-raising character:

> [I]t is well established that a licensing fee is permissible, but a state or
> municipality may charge no more than the amount needed to cover
> administrative costs.  The government may not profit by imposing
> licensing or permit fees on the exercise of first amendment rights, and
> is prohibited from raising revenue in the guise of defraying its
> administrative costs.

Id. at 1205 (citations omitted).

While a government acting facially or impliedly in its capacity as regulator

or licensor cannot profit from the exercise of First Amendment rights, it is not the

law that a government, universally, is prohibited from imposing profit-making or

revenue-raising fees on First Amendment expression.  We hold that when a

government acts in a proprietary capacity, that is, in a role functionally

indistinguishable from a private business, then commercially reasonable, profit-

conscious contracts may be negotiated for distribution space in a non-public forum

for First Amendment activities, subject to structural protections that reduce or eliminate the possibility of viewpoint discrimination.[14]

### III. CONCLUSION

Based on the foregoing discussion, we find that the Department can impose a profit-conscious fee on the use of newsracks in the Airport, but that the discretion surrounding such fee must be restrained through procedures or instructions designed to reduce or eliminate the possibility of viewpoint discrimination. Therefore, we **VACATE** the injunction entered by the district court to the extent that such injunction prohibited the imposition of a profit-conscious fee for the use of newsracks at the Airport, and we retain that portion of the injunction that prohibited the administration of any plan that did not explicitly constrain official discretion. We **REMAND** this case to the district court with instructions to afford the Department an opportunity to formulate ascertainable non-discriminatory standards for the exercise of discretion by the appropriate Department official. Upon remand, the district court should not be precluded from considering the City's claim, if any, for lost revenues from enjoined fees that we

---

[14] We note that at least two other circuits are in accord. See Jacobsen v. City of Rapid City, S.D., 128 F.3d 660, 664 n.2 (8th Cir. 1997); Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Auth., 745 F.2d 767, 774 (2d Cir. 1984); cf. Children of the Rosary v. City of Phoenix, 154 F.3d 972 (9th Cir. 1998) (holding that city could properly exclude anti-abortion group from advertising on municipal buses, which advertising was sold for the purpose of raising municipal revenue).

have determined were constitutionally permissible, and, upon approval of the

Airport's new newsrack Plan, this case should be finally resolved.

TJOFLAT, Circuit Judge, concurring:

I concur fully in Judge Birch's opinion for the court. I also concur in Judge Carnes's view that, on remand, in accordance with long standing Supreme Court precedent, the City should be made whole for the fees it was enjoined from collecting.

ANDERSON, Circuit Judge, concurring:

Believing as I do that the opinion for the court with respect to unbridled discretion applies not only to accepting or rejecting a potential publisher's request to rent a news rack and the cancellation thereof, but also to the determination of the amount of the rent charged, I concur in and join the opinion.

I also note that in determining the amount of the rent, a rental charge based on the same formula applied to the rental of space for other purposes in the airport would constitute a generally applicable rent, and virtually foreclose a First Amendment challenge based upon the amount of the rent. See Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 103 S.Ct. 1365 (1983). My understanding of the challenged rental charge in this case is that it is substantially similar in amount as that charged for rental space for other purposes. Although the opinion for the court notes that the instant rent is not calculated on the basis of the same mathematical formula, it nevertheless is substantially similar, and is "not an aberration within this scheme of vendor regulation." Opinion of the court at ___, M/S at 27. Moreover, the opinion for the court examines extensively the reasonableness of the amount of the instant rent and concludes that it is in fact reasonable, and does not appear to be "applying monopolistic muscle to the publishers." Opinion at ___, M/S at 23.

33

I acknowledge some reluctance with respect to placing undue reliance upon the distinction between a proprietorship capacity and a governmental function. In different contexts, the Supreme Court has rejected the proprietary versus governmental function distinction. See Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005 (1985) (in the context of the immunity of a state from federal regulation pursuant to the Interstate Commerce Clause); New York v. United States, 326 U.S. 572, 66 S.Ct. 310 (1946) (in the context of state immunity from federal taxation). However, the Supreme Court itself in Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870 (1943), relied upon the distinction as to "whether a particular activity is religious or purely commercial" id. at 110, 63 S.Ct. at 874. Of course, the Murdock line of cases is the source of the concept that a state may not impose a charge for the enjoyment of a right granted by the federal constitution where the fee is not calculated to defray the expense of administering the regulatory scheme. Because Murdock itself suggests that the rule might be otherwise in the context of licensing a commercial activity, I believe that the distinction is appropriate here. Moreover, common sense suggests that the Department should be able to charge a reasonable rent for the exclusive use of limited space in the airport, a rent substantially similar to that charged for the rental of other space. Finally, the possibility of suppression

34

or censorship which concerned the Court in <u>Murdock</u> is significantly diluted here because the instant rental charge is considerably more indirect with respect to its impact upon speech, as compared to the fees charged in <u>Murdock</u> for the privilege of canvassing.

CARNES, Circuit Judge, concurring, in which DUBINA, Circuit Judge, joins:

I concur in all that the Court has said in this case, including the understatement in the last sentence of its opinion that on remand "the district court should not be precluded from considering the City's claim, if any, for lost revenues from enjoined fees that we have determined were constitutionally permissible." That is an understatement because the City lost substantial revenue during the six years it was wrongfully prevented from collecting constitutionally permissible fees from these publisher plaintiffs, and it has a legally and equitably compelling claim for recovery of those fees from the plaintiffs.

At the urging of these plaintiffs and on their behalf, the district court enjoined the City from adopting an airport newsrack plan that required publishers to pay a fee exceeding the City's cost of administering the plan. Eleven of eleven judges on this Court who participated in this case have now determined that part of the injunction should never have been entered. As a result of that part of the injunction, for years the City has not been permitted to collect a fee that this Court has unanimously determined is reasonable and constitutionally permissible. We have concluded that the City should never have been prevented from collecting that fee from these plaintiffs.

The question on remand will be what to do about the revenue the City should have been permitted to collect from these plaintiffs over the years of this litigation, and would have collected but for the erroneous part of the injunction the plaintiffs procured. The answer is clear. The Supreme Court has recognized and made a part of federal law "the principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co., 249 U.S. 134, 145, 39 S. Ct. 237, 242 (1919); accord N.W. Fuel Co. v. Brock, 139 U.S. 216, 221, 11 S. Ct. 523, 525 (1891) ("The same doctrine is sustained in the several state courts of the country, all recognizing the power of a court, whose judgment is set aside on its own motion or reversed by order of an appellate tribunal, to direct restitution, so far as practicable, of all property and rights which have been lost by the erroneous judgment."); Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 873 (1st Cir. 1995) (referring to the rule quoted from Arkadelphia as a "hoary adage"); Md. Dep't of Human Res. v. United States Dep't of Agric., 976 F.2d 1462, 1482-83 (4th Cir. 1992) (recognizing and applying the rule on behalf of the government).

The principle that a party ought to be required to pay back to another that which it wrongly obtained or wrongly failed to pay through the device of an erroneous court judgment is not a radical notion. Instead, as the Supreme Court has observed, "[i]t is a typical case for the application of the principle of restitution." Arkadelphia, 249 U.S. at 146, 39 S. Ct. at 242. Typical or not, the application of the principle in this case is one with which Judge Barkett disagrees. Her position is mistaken because it conflates separate parts of the injunction and disregards the different effects of our judgment on them.

In her concurring opinion, Judge Barkett says that "the City can have no entitlement to fees it might have collected during the pendency of this litigation because it has never formulated a licensing scheme that would suitably constrain airport officials' discretion." An essential premise of that syllogism is demonstrably wrong. The premise is that without a licensing scheme which constrains official discretion, the City could not charge any fee for use of its property at the airport. Of course it could. The fee is charged for commercial use of property – valuable space at the airport – not for suitable constraints on official discretion.

Look at it this way. There is nothing in the Constitution to prevent the City from throwing open its airport for the use of any publishers who wish to put

newsracks there and charging them a reasonable fee for as much of the airport property as they choose to use. Likewise, once the district court enjoined the City, in effect, to open its property to these publishers, nothing in the Constitution prevented the City from charging a fee that we have determined is reasonable and constitutionally permissible. Indeed, that is the bottom line of our decision.[1]

We have left intact the part of the injunction preventing the City from exercising unbridled discretion in deciding which publishers can lease space for newsracks at the airport, but we have vacated that part of the injunction prohibiting the City from collecting the reasonable fee for use of that space, which it would have been collecting all along had the plaintiffs not convinced the district

---

[1]The argument Judge Barkett makes in the footnote of her opinion is at war with the en banc Court's decision which she has joined. Her polite theory cannot survive the rude fact that we all have agreed the district court should never have entered the injunction preventing the City from collecting the fee. That is why we have vacated that part of the injunction. Any other aspects of the plan that are unconstitutional could have been and still may be enjoined, but the fee collection cannot be and should never have been enjoined. That is the holding of the en banc Court, and it brings this case on remand within the controlling authority of Arkadelphia and related decisions cited in this opinion. It is noteworthy that the only decision Judge Barkett's opinion cites, Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 755 - 56, 108 S.Ct. 2138, 2142 - 43 (1988), has nothing to do with the collection of non-discriminatory fees or with restitution for damages suffered from a wrongful injunction.

The view expressed in Judge Barkett's opinion is that businesses which make money by selling newspapers are entitled to better treatment than those that sell food and drink. In some contexts and circumstances perhaps, but not when it comes to paying for lease space. The First Amendment does not entitle publishers to a discount on the price of lease space for their newsracks anymore than it entitles them to a discount on the price of electricity used to run their presses. When publishers go into the marketplace as commercial enterprises seeking to make a profit, they must pay the ordinary and usual costs of doing business, just as any other businesses must.

court erroneously to exempt them from it.  Our decision is that excluding publishers from the commercial use of airport space based upon the exercise of unbridled discretion is not permitted; collecting a reasonable fee from whomever uses airport property, regardless of whether there is a valid scheme in place for limiting the use of that property, is permitted.

These plaintiff publishers have for years used space at the airport for commercial purposes without paying the constitutionally permissible fee that the City attempted to collect from them.  Everyone else who has used space at the airport commercially has paid for it.  So should they, the Court has concluded today, because the constitutional right to publish does not include a privilege to occupy the property of another at no cost.  That is what these publishers have been doing – getting something for nothing.   They have had their hand in the City's pocket for six years, and now they owe restitution.

On remand, the district court has no choice about this aspect of the case.  It cannot reinstate the part of the injunction we vacated.  It cannot prevent the City from collecting the fees that we have determined are reasonable and constitutionally permissible.  It cannot pretend that the City was not entitled to collect those fees from the plaintiffs during the entire period this case has been in

litigation. It cannot fail to recognize the City's right to restitution from the plaintiffs for the loss caused by the part of the injunction that is now vacated.

This is not a complicated matter. For six years these publisher plaintiffs and the multi-billion dollar corporate conglomerates of which they are a part have been getting a free ride on the public's back. It is time for them to pay up. They owe the City an amount equal to the total of all the fees that the City would have collected over the years but for the wrongful part of the injunction they persuaded the district court to enter. Plus interest. See Baltimore & O.R. Co. v. United States, 279 U.S. 781, 786, 49 S. Ct 492, 493 (1929); Arkadelphia, 249 U.S. at 147, 39 S. Ct. at 242. In the days of the Arkadelphia decision, it was too much to expect that in similar circumstances the barons of big business who ran the railroads would pay what they owed without a court order. One would hope that these particular plaintiffs, powerful publishers whose papers preach principles of public duty and civic virtue, might recognize their own legal, equitable, and civic duty in this instance. If not – and statements of USA Today's attorney at oral argument indicate not – the district court must force them to pay up, just as courts forced the robber barons of old to pay what they owed.

BARKETT, Circuit Judge, specially concurring:

I concur in the majority's conclusions that the government may sometimes collect profit-conscious fees in regulating First Amendment activities in nonpublic forums, and that Hartsfield International Airport's regulatory scheme nonetheless violated the First Amendment by vesting unbridled discretion in licensing officials. However, I do not believe there is any basis for the majority's gratuitous comment that the district court should not, upon remand, "be precluded from considering the City's claim, if any, for lost revenues from enjoined fees that we have determined were constitutionally permissible." Notwithstanding the majority's equivocation, the City can have no entitlement to fees it might have collected during the pendency of this litigation because it has never formulated a licensing scheme that would suitably constrain airport officials' discretion. If the airport is to collect profit-conscious fees for the lease of newsracks, it must first return to the drawing board and devise a new licensing plan that does not vest unrestrained discretion in any official.[2] Only if such a plan is thereafter

---

[2]I believe the view expressed by Judge Carnes fails to take into account the special solicitude which our Constitution and many decades of jurisprudence have shown for expression. It seems to me wrong to state that Hartsfield International Airport officials may "collect[] a reasonable fee from whomever uses airport property, regardless of whether there is a valid scheme in place for limiting the use of that property," and the majority in this case certainly does not grant officials any such permission. While this rule might well state the airport's authority with respect to vendors of ice cream bars or soft drinks, it does not accord with the First Amendment's limitations on the regulation of expressive activity. The Supreme Court has held

improperly enjoined might the city establish an entitlement to recover lost

revenues.  Because the majority opinion does not reach any contrary conclusion, I

concur.

---

that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."  City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 755-56 (1988).  Facial challenges are permitted because it is the very existence of unbridled discretion to regulate expressive activity, and not simply its application to any particular speaker, against which the First Amendment protects.  Since the plan under which the City proposed to collect fees vested unbridled discretion in officials, the City has always been without authority to enforce any part of it.

The hypothetical regulation envisioned by Judge Carnes in his concurrence, whereby the City might "throw[] open its airport for the use of any publishers who wish to put newsracks there and charg[e] them a reasonable fee for as much of the airport property as they choose to use," simply assumes away the basis on which today's decision rests.  Were licenses available to any publisher who wished to place a newsrack at Hartsfield, we would have no ground to find the plan unconstitutional as a result of officials' unbridled discretion.  So long as we treat of the circumstances actually before us, however, we may not consider the plan as consisting of two separate components, one vesting unbridled discretion in officials (unconstitutional) and the other allowing for the collection of reasonable fees (constitutional).  Accordingly, the City has no entitlement to recoup fees it might have collected had it chosen, instead of fighting the newspapers in the district court, before a panel of this Court, and then before this Court en banc, to devise a scheme of regulation that simultaneously provided for the imposition of reasonable fees and suitably constrained airport officials' discretion.  The line of cases cited by Judge Carnes regarding a litigant's right to be made whole after a wrongful injunction is wholly inapposite.

43